RAINEY v. HOGSETT et al.

(Circuit Court of Appeals, Third Circuit. February 16, 1900.)

No. 3.

VENDOR AND PURCHASER—CONSTRUCTION OF CONTRACT.

A contract for the sale of coal lands provided that the purchaser was to have at least 500 acres of mineable coal, and for any shortage from that quantity he should be allowed a credit on an installment of purchase money to become due in one year. It further provided that any claim for shortage should be made within three months, after which the vendor should have the right to have a survey made. Within the time fixed the purchaser made a claim to a shortage of 16 acres, which claim, after having a survey made, the vendor denied, and while matters were in that condition the payment became due. A partial payment was made, and the vendor gave a receipt extending the time for future payments, and providing that, "if there shall be any shortage in the acreage of coal, the amount to be deducted on account thereof" should be deducted from a subsequent payment, and that "the amount of said shortage is to be ascertained within six months." *Held,* that under such agreements, construed together, the purchaser was not limited in his claim of shortage to the 16 acres of his original claim, but that the second agreement contemplated the allowance of "any shortage" ascertained within the six months.

Dallas, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Western District of Pennsylvania.

Nathaniel Ewing and C. C. Dickey, for plaintiff in error.
Johns McCleave, for defendants in error.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

ACHESON, Circuit Judge. On February 20, 1893, by deed of that date, Robert Hogsett conveyed certain coal lands, situate in Fayette county, Pa., unto William J. Rainey, who gave a bond, secured by a mortgage on the property, for a balance of the purchase money, payable in 10 equal annual installments, with interest. This suit is a scire facias on the mortgage brought to recover the installment, payable on February 20, 1896. The deed and mortgage were executed under an agreement in writing dated December 28, 1892, containing the following provision:

"(6) It is intended that the party of the second part shall have by the proposed purchase at least five hundred (500) acres of mineable coal, it being assumed that the ribs, etc., of said mines available and fit to make good coke are sufficient, with the solid coal, to make that quantity. It is not expected, however, that the party of the second part will make a survey of said coal and mines before accepting the deed and taking possession. But it is provided that, if there is any shortage in the said quantity of 500 acres, the same shall be allowed for at the rate of eight hundred dollars per acre, and credited upon the first installment of the mortgage given by the party of the second part.

And it shall be the duty of the party of the second part to make his claim for shortage, if any he finds, within three months after entering upon the said property, and he shall give the party of the first part full opportunity of investigating the same by making any additional surveys he may desire to make."

The purchaser, William J. Rainey, having entered upon the property, made within the specified time the following claim for shortage:

"Mr. Robert Hogsett, Uniontown, Pa.—Dear Sir: A survey of the Mt. Braddock property purchased by me from you under agreement dated December 28, 1892, reveals the fact that the unmined coal in the tracts amounts to four hundred and seventy-four acres, and that the ribs, etc., of said mines available and fit to make good coke contain ten acres of mineable coal, which makes sixteen acres less than the agreement provided I should have. I therefore make a claim for this shortage of sixteen acres. at the rate of eight hundred ($800.00) dollars per acre, amounting to twelve thousand and eight hundred ($12,800) dollars, to be deducted from the first installment of bond and mortgage given by me to you for balance of purchase money, as provided for in said agreement.                                             W. J. Rainey.

"Cleveland, Ohio, May 10, 1893."

This claim Hogsett would not agree to, and he rejected it. In June, 1893, he had a survey of the property made, and it would seem that from the report thereof made to him he took and thereafter maintained the position that there was no shortage of coal at all. On the day before the first installment of the mortgage matured, namely, on February 19, 1894, the parties made a supplemental agreement, the terms of which were embodied in the following receipt signed by Hogsett, and given by him to Rainey:

"Uniontown, Pa., Feb. 19, 1894.

"Received of William J. Rainey his check for $25,000.00, being payment of the interest due on bond dated February 20, 1893, and $5,720.00 on account of installment of principal due February 20, 1894; and I hereby agree that the time of payment of the balance of this installment shall be extended one year from this date, and all the remaining payments are extended one year from the time fixed in said bond. If there shall be any shortage in the acreage of coal, the amount to be deducted on account thereof shall be deducted from the payment of February 20th, 1896. The amount of said shortage is to be ascertained within six months.                                          Robert Hogsett.

"S. E. Ewing, Witness."

There was evidence in the case to show that there was an actual shortage in the mineable coal of about 26 acres, and evidence to show a still further shortage was offered and rejected. There was also evidence to show that within the six months specified in Hogsett's receipt of February 19, 1894, Rainey, by his agent, saw Hogsett, and claimed a shortage of 26 acres, and endeavored, unsuccessfully, to have Hogsett come to an agreement with respect to the amount of shortage, but that Hogsett denied there was any shortage, and persisted in such denial. The court instructed the jury that the amount of defalcation for shortage in coal to which Rainey was entitled was limited to the 16 acres claimed by him in his notice of May 10, 1893, and directed a verdict accordingly.

In so instructing the jury, the trial court, we think, failed to give effect to the intention of the parties, with respect to the allowance for shortage in the coal, as disclosed by the original agreement and the supplemental agreement, taken together. The leading intention

of both parties, as declared in the sixth paragraph of the agreement of December 28, 1892, was that the purchaser should get at least 500 acres of mineable coal, and that for any shortage he was to be allowed a deduction at the rate of $800 an acre. To accomplish this ruling purpose, it was provided that the purchaser should make claim within three months after entry; that then the vendor should have full opportunity for investigation, by additional surveys, if desired; and, finally, that the deduction be made from the first installment of purchase money, which fell due February 20, 1894. This scheme failed, but from no fault of Rainey. He made claim within the stipulated time, and then gave Hogsett full opportunity for investigation. The latter sent his surveyor into the mines, and had a survey made. The result was a denial by Hogsett of any shortage. Thus the question of the amount of shortage was entirely open between the parties when the supplemental agreement set forth in Hogsett's receipt of February 19, 1894, was entered into. This is recognized in and by that paper, which states:

"If there shall be any shortage in the acreage of coal, the amount to be deducted on account thereof shall be deducted from the payment of February 20, 1896. The amount of said shortage is to be ascertained within six months."

Now, upon the face of this stipulation, there is neither concession of the existence of any shortage, nor limitation upon deduction, if shortage should be found. To restrict the allowance for shortage, it is necessary to read into the paper unexpressed terms.

Looking at the language employed in Hogsett's receipt, is it to be believed that the parties intended that, although within the designated six months it should be demonstrated that there was a shortage of 26 acres, yet the deduction should be restricted to 16 acres? If such was the intention, nothing was easier than to say so. Why should Hogsett be permitted to fall back on a claim unduly limited by reason of a mistake of fact, and which claim he refused to accept when he had the opportunity to do so, and, indeed, had utterly repudiated? To construe the recited provision in Hogsett's receipt as not only postponing the deduction for shortage two years, but also as giving him six months more time within which to reduce, if he could, the amount of the claim Rainey had made, strikes us as a very one-sided rendering of it. Certainly, the language used does not require a construction which compels Rainey to pay for more coal than he got. The fairer reading of the clause is that within the specified six months the true amount of shortage, if any existed, should be ascertained. This is the apparent meaning of the clause, and, we think, is its real meaning. This conclusion leads to a just result, and effectuates the fundamental intention of the parties, unequivocally expressed in the original agreement. In Canal Co. v. Hill, 15 Wall. 94, 21 L. Ed. 64, it was declared that, where the substantial thing which the parties have in mind can be gathered from their whole agreement, it will control mere formal provisions, which are intended only as means of attaining the substance; and in Heryford v. Davis, 102 U. S. 235, 244, 26 L. Ed. 160, it was said that the construction of an instrument is to be determined by the ruling intention of the parties, gathered from all the

language they have used. The judgment of the circuit court is reversed, and the case is remanded to that court, with direction to grant a new trial.

DALLAS, Circuit Judge (dissenting). I am unable to concur in the conclusion reached by the majority of the court upon the controlling question in this case,—the effect to be ascribed to the receipt of February 19, 1894. I agree that this "is not to be found in any name which the parties may have given to the instrument, and not alone in any particular provisions it contains, disconnected from all others, but in the ruling intention of the parties, gathered from all the language they have used. It is the legal effect of the whole which is to be sought for. The form of the instrument is of little account." Heryford v. Davis, 102 U. S. 243, 26 L. Ed. 160. I agree, too, that it is the province of the court to "carry out the intent of the parties as gathered from the whole instrument and the state of affairs existing at the time it was made." Canal Co. v. Hill, 15 Wall. 103, 21 L. Ed. 68. And I quite agree that the familiar rule respecting the interpretation of documents in the light of surrounding circumstances, which was obviously in mind when the language last quoted was used, must be resorted to in endeavoring to solve the question of construction which is here presented. The point is not as to the acceptance of that rule, but as to the consequence which results from its application to the particular circumstances of this case.

Placing ourselves in the situation of the parties when this receipt was given, we find that the circumstances which they must have had in view were as follows: Rainey, being in possession, had, within the time specified in the agreement of purchase, made a claim for "shortage of 16 acres, * * * to be deducted from the first installment of bond and mortgage given by me [Rainey] to you [Hogsett] for balance of purchase money, as provided for in said agreement." Hogsett did not assert, and could not have truly asserted, that this claim was not made in accordance with the terms of the agreement referred to, but he rejected it as being wholly unfounded, and then insisted, and thereafter maintained, that there was not in fact any shortage whatsoever. This, then, was the condition of affairs on the day preceding that upon which the first installment of the mortgage debt matured. Rainey had made a claim, for which, if correct, he was entitled to be credited against the installment then about to fall due. This claim, and no other, had been made within the prescribed period, and the only difference between the parties related to that identical claim, and to nothing else. Rainey alleged that there was a shortage of 16 acres. Hogsett denied the existence of any shortage, and the issue thus joined presented the one obstacle which impeded the settlement of the amount falling due on the morrow. The right of Rainey to demand a deduction for a specific shortage had been exercised and exhausted. The "ruling intention," as "gathered from all the language used" in the principal agreement,—the "legal effect of the whole" of that instrument,—was not that Rainey should be accorded an allowance

for any shortage that might exist, but only for such shortage as he might designate and claim within three months. Heryford v. Davis, supra. Consequently, the question of the extent of the shortage was not entirely open when the receipt of February 19, 1894, was given. The question had been circumscribed by the claim which had been made, and nothing remained unclosed but the contention concerning the correctness of that claim. The parties were dealing with an actual situation, and the paper of February 19, 1894, contained nothing to warrant the assumption that they intended thereby to ignore that situation, or to vary their more formal previous contract, further or otherwise than as in and by the receipt itself (which says nothing whatever about extending the time for making claim) was expressly provided. Under and with reference to the claim already made, there was an existing dispute as to whether there was any shortage. This dispute it was which stood in the way of adjustment and payment of the first installment under the mortgage; and hence it was agreed, not that Rainey might add to his claim, but that the amount to be deducted on account of it should be abated from the payment to mature a year later, instead of from the presently due installment, and that "the amount of said shortage" should "be ascertained," not a further claim be made, "within six months." The words, "if there is any shortage in the said quantity of 500 acres," were used in the original contract, but it cannot be doubted that the shortage to be allowed for under that contract was limited to any shortage that should be claimed for within three months. Why, then, should it be supposed that the equivalent language of the receipt, namely, "if there shall be any shortage in the acreage of coal," was intended to be unqualifiedly inclusive? When the original agreement was entered into, a claim was contemplated; when the receipt was given, that claim had been made. In the one instance, the term "any shortage" was defined by the provision requiring a claim within a fixed time; in the other, by the fact that a claim had, within that time, been actually presented. If it had been intended to broadly reopen the whole question of shortage, nothing would have been easier than to plainly express that intention; but this was not done, and, in view of the circumstances which have been referred to, I do not think such intent can rightly be inferred from the employment of the words "any shortage." Those words should be relatively considered, and not in the abstract, nor with absolute literality, to the end that the whole reason of the thing may be regarded, and the object in view—the postponement of a dispute, not the expansion of its subject-matter—shall be effected. In Reed v. Insurance Co., 95 U. S. 30, 24 L. Ed. 349, the case, upon its merits, depended solely upon the construction to be given to a clause in a policy of insurance in these words, "the risk to be suspended while vessel is at Baker's Island loading," and turned upon the point whether that clause meant "while the vessel is at Baker's Island for the purpose of loading," or "while it is at said island actually loading." The supreme court held the former to be the true meaning, quoting, with approval, from Tayl. Ev. §§ 1082, 1085, as follows:

"Whatever be the nature of the document under review, the object is to discover the intention of the writer, as evidenced by the words he has used; and, in order to do this, the judge must put himself in the writer's place, and then see how the terms of the instrument affect the property or subject-matter. * * * It may, and indeed it often does, happen that, in consequence of the surrounding circumstances being proved in evidence, the courts give to the instrument, thus relatively considered, an interpretation very different from that which it would have received had it been considered in the abstract."

In applying these principles, the court said:

"The whole reason of the thing and the object in view point to the intent of protecting themselves while the vessel was in that exposed place for the purpose referred to, not merely to protect themselves while loading was actually going on."

—And therefore that intent was given effect, although it was expressly conceded that, "taking this clause in absolute literality, the risk was only to be suspended when loading was actually going on."

No construction of any contract can be a just one which does not hold the parties to their entire agreement, and I do not think that justice can be attained by sustaining either party's demand of a contractual right, however fundamental, when the terms and conditions upon which the right was acquired have not been fulfilled. By the original agreement in this case, the right to allowance was made dependent upon the making of claim within three months. Without such claim there was no right. Courts of law cannot make or alter contracts, and there does not appear to me to be any reason for desiring to do so in the present instance. No hardship was inflicted upon the plaintiff in error by confining him to the claim for 16 acres, which he had made in due season, for to this he had agreed, and it may safely be assumed that he made that claim advisedly, and with a full appreciation of his own interest. But, on the other hand, it does seem to me that it would have been most unfair to the defendant in error to have required him to meet on the trial the untimely claim for a shortage either of 26 acres or 45 acres, although, for manifest good reason, he had by his contract of sale protected himself against any such demand being set up.